## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
**Lynchburg Division**

| | |
|---|---|
| In re:<br><br>IBCS Mining, Inc., <u>et al.</u>[1]<br><br>Debtors. | Chapter 11<br>Case No. 14-61215<br>Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION DATE FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)
AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364
AND (III) SCHEDULING FINAL HEARING
<u>PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)</u>**

Pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), IBCS Mining, Inc., <u>et al.</u>, as debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), file this Motion (this "**Motion**") for entry of an

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  IBCS Mining, Inc., (8425) and IBCS Mining, Inc., Kentucky Division (8711).  The location of the Debtors' service address is 944 Glen Wood Station Lane, Suite 101, Charlottesville, Virginia 22901.

Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:      804.771.9500
Facsimile:      804.644.0957
E-mail:  rwestermann@hf-law.com
              rgreenleaf@hf-law.com

*Proposed Counsel for the Debtors*

interim and final order, each substantially in the form attached hereto as Exhibit A (the "**Interim Order**"), (a) authorizing IBCS Mining, Inc., et al., on an interim basis, to enter into the Superpriority Debtor-in-Possession Credit Agreement, for post-Petition Date financing up to an aggregate principal amount not to exceed $3.5 million to (i) fund the operational and working capital needs of the Debtors, and (ii) pay the fees, costs and expenses incurred by the Debtors in connection with these chapter 11 cases (these "**Cases**"); (b) authorizing the Debtors' use of cash collateral ("**Cash Collateral**"), and all other collateral; (c) granting senior liens and superpriority administrative expense claims; and (d) authorizing the Debtors, subject to and effective upon entry of the Final Order (as defined below) granting the foregoing relief, to waive any right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code. The Debtors also request that the Court schedule a hearing to consider approval of the DIP Credit Agreement and authorize the relief granted in the Interim Order on a final basis (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"). In support of this Motion, the Debtors respectfully represent as follows:

### Preliminary Statement

1        By this Motion, the Debtors seek immediate access to their proposed post-Petition Date financing in order to ensure their continued operations during these Cases. The Debtors intend to preserve and enhance their businesses and continue to explore various strategic alternatives, including a possible sale of some or substantially all of their assets and/or a reorganization pursuant to a third-party sponsored plan of reorganization, through the use of a post-Petition Date credit facility consisting of a $3.5 million superpriority senior secured debtor in possession term facility (the "**DIP Financing Facility**") pursuant to the DIP Credit Agreement. The DIP Financing Facility will provide the Debtors the necessary liquidity to fund

their operations, working capital needs and general corporate purposes during the course of these Cases. The DIP Financing Facility is essential to the continued operation of the Debtors' businesses and the Debtors' efforts to consummate a value-maximizing restructuring transaction. With the funds from the DIP Financing Facility, the Debtors will have sufficient time and breathing room to complete their ongoing marketing process and pursue the transaction available to their businesses that will maximize recoveries for their estates and creditors. Absent access to the DIP Financing Facility, the Debtors will not have adequate cash on hand to satisfy their debt obligations and maintain operations, resulting in immediate liquidation, severe employee dislocation and crippling losses for vendors and customers. Therefore, the Debtors' customers, their employees and all of the Debtors' constituents depend on the Debtors' ability to access to the DIP Financing Facility so that the Debtors may continue operating.

2       Obtaining the DIP Financing Facility on the terms proposed is well within the sound discretion of the Debtors, as it will allow the Debtors to stabilize their operations and preserve and maximize the value of their estates for the benefit of all parties in interest.

3       Moreover, the Debtors' decision to enter into the DIP Financing Facility is the culmination of a rigorous marketing process and exploration of available strategic alternatives. After evaluating their options and assessing the state of the financing markets, the Debtors have determined that the DIP Credit Agreement with the lender thereunder (the "**DIP Lender**") represents the most reasonable and viable option for obtaining the additional liquidity necessary to sustain the Debtors' operations as they pursue a restructuring transaction in chapter 11 for the benefit of their estates and creditors. Without the DIP Financing Facility, the Debtors will be unable to obtain the liquidity necessary to maintain operations.

4.      The Debtors respectfully request that this Court grant them authority to access up to $2 million of the DIP Financing Facility on an interim basis pursuant to the Interim Order.

5.      For the reasons set forth herein, the Debtors believe that authorization to obtain the DIP Financing Facility and use the Cash Collateral is in the best interests of the Debtors, their estates and their stakeholders and should be granted.

### Background and Jurisdiction

6.      On June 27, 2014 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Cases pursuant to Bankruptcy Rule 1015(b).

8.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Edmund Scarborough, IBCS Mining, Inc.'s President (the "**Scarborough Declaration**"), which is incorporated herein by reference.

9.      The Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by the Court. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are sections 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 6004.

## Concise Summary of Terms of the DIP Financing Facility

10.    In accordance with Bankruptcy Rules 4001(b), (c) and (d), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[2] The Debtors believe that the following provisions of the DIP Credit Agreement and the Interim Order are justified and necessary in the context and circumstances of these cases.

| MATERIAL TERMS OF THE DIP FINANCING FACILITY | |
|---|---|
| Borrower | IBCS Mining, Inc., and IBCS Mining, Inc., Kentucky Division |
| Limited Guaranty | Edmund and Yvonne Scarborough shall provide limited remedy mortgages on their residences in Virginia and Florida.[3] |
| DIP Lenders | Callidus Capital Corporation |
| Use of Proceeds | The proceeds of the DIP Financing Facility shall be used to: (i) pay fees, costs and expenses associated with these Cases, (ii) fund the operational and working capital needs of the Debtors and (iii) pay the fees, costs and expenses incurred in connection with the foregoing. |
| Commitments | The DIP Financing Facility is a $2.5 million superpriority senior secured term loan and a $1 million revolving loan, to be drawn in an initial amount up to $2 million upon entry of the interim order, subject to satisfaction of the terms therein with the balance to be made available upon the acceptance of a stalking horse bid by the Debtors. |
| Maturity Date | The DIP Loan shall be due on the earliest of:  (i) December 15, 2014; (ii) the occurrence of an Event of Default; (iii) the closing of a sale pursuant to an Order authorizing a sale of all or substantially all of the Debtors' assets; or (iv) the effective date of any confirmed plan of reorganization |
| Fees | **Closing Fee**:  The Debtors shall pay the DIP Lender a non-refundable facility fee of $210,000, of which $140,000 (the "**Approval Date Closing Fee**") is payable upon the entry of this Order and $70,000 will be due on Maturity Date (the "**DIP Closing Fee**"). <br><br> **Collateral Monitoring Fee**:  $5,000 per month, payable on the first business day of each month in arrears until the DIP Loan is paid in full. <br><br> **Unused Line Fee**:  One percent (1%) per annum on any unused portion of the DIP Loan on the first day of each month in arrears until the DIP Loan is paid in full. <br><br> **Lender Expenses**:  All reasonable fees and out-of-pocket costs and expenses incurred by DIP Lender, incurred both prior to and after the Petition Date, in monitoring, administering or providing financing or enforcing its rights and remedies hereunder, or in enforcing rights against any guarantors, except that, notwithstanding the foregoing, the Debtors shall not be |

---

[2]    The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Documents, which shall control in the event of any inconsistency

[3]    The terms of the limited guaranty are still being negotiated.

| MATERIAL TERMS OF THE DIP FINANCING FACILITY | |
|---|---|
| | responsible for any such fees, costs and expenses caused by Lender's gross negligence, willful misconduct, breach of an enforceable contractual obligation, or breach of a court order. |
| **Interest Rates** | **Base Rate**: The DIP Loan shall bear interest at a rate to 18% per annum on the outstanding day-to-day principal balance.<br><br>**Default Interest Rate**: From and after an Event of Default (defined below), the DIP Loan shall accrue interest at three percent (3%) per annum above the otherwise applicable interest rates. |
| **Collateral, Priority, and Adequate Protection** | **Collateral**: All property of the Debtors arising or created before or after the Petition Date, but excluding any judgments or proceeds of a cause of action against any person or entity arising under Chapter 5 of the Bankruptcy Code.<br><br>**Superpriority Claims**: DIP Obligations are allowed administrative expense claims against the Debtors, and shall have priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever.<br><br>**DIP Liens**: Subject only to the Carve-Out and valid, perfected, unavoidable and enforceable purchase money security interests (the "**Permitted Senior Liens**"), the DIP Obligations shall be secured by (1) first-priority liens on unencumbered Collateral; (2) junior liens on Collateral subject to permitted senior liens; and (3) priming liens on encumbered Collateral.<br><br>**Adequate Protection**: The Debtors will provide adequate protection to the Pre-Petition Date Secured Creditors in the form of section 507(b) claims and replacement liens upon all Collateral. |
| **Carve-Out** | The DIP Lender's security interests in the Collateral and Superpriority Claims are subject to a carve-out (the "**Carve-Out**") of: (i) all fees required to be paid to the clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930; (ii) fees and disbursements incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code, in an amount not to exceed $10,000; (iii) accrued but unreimbursed expenses of members of the official committee of unsecured creditors appointed (the "**Committee**") as allowed by the Court; and (iv) accrued but unpaid fees and expenses of professionals retained by the Debtors or the Committee and allowed by the Court (such allowed fees and expenses, "**Professional Fees**"), in an amount not to exceed $250,000 (the "**Professional Fees Carve-Out Amount**"); *provided* that (x) the Professional Fees Carve-Out Amount shall not be reduced by the payment of Professional Fees allowed by the Court at any time that an Event of Default has not occurred or is not continuing and (y) if an Event of Default has occurred and is continuing, or the Maturity Date has occurred, any payments of allowed Professional Fees after an Event of Default has occurred and is continuing, or after the Maturity Date, shall reduce the amount of the Professional Fees Carve-Out Amount by the amount of any such payment; *and, provided, further*, that the portion of the Carve-Out applicable to Professional Fees (up to the Professional Fees Carve-Out Amount) shall be limited to a $250,000 carve-out of the DIP Lender's liens on the Collateral. In no event shall any of the Carve-Out be used to pay any fees or expenses of any person retained in a chapter 7 case under section 326, 327 or 328 of the Bankruptcy Code. |
| **Covenants** | The covenants are usual and customary for financings of this type, including, without limitations, provision of information regarding collateral, provision of certain financial information, provision of a budget variance report and budget results, maintenance of properties and insurance, and access to Debtors' records and inventory. |
| **Events of Default** | Usual and customary for financings of this type, including, without limitations, material breach of the Interim Order, nonpayment of principal or interest when due, breaches of representations and warranties, conversion to Chapter 7, appointment of Chapter 11 trustee, |

| MATERIAL TERMS OF THE DIP FINANCING FACILITY | |
|---|---|
| | challenge to DIP Orders, default as to other indebtedness and obligations, and superpriority claims pari passu with the Superpriority Claims. |
| **Change of Control** | Advances under the DIP Loan are conditioned upon (i) David Stetson being appointed and continuing to be retained as the Chief Restructuring Officer of the Debtors pursuant to an agreement reasonably acceptable to the DIP Lender and by Order of this Court reasonably acceptable by the DIP Lender; and (ii) Ed Scarborough having no managerial, financial, or executive authority or responsibility at either Debtor |
| **Limitations on Use of DIP Financing Facility and Cash Collateral** | No portion of the DIP Loan, the Collateral, the Cash Collateral, or the Carve-Out shall be used or be available to pay any fees, disbursements, costs or expenses incurred by any party in connection with: (i) challenging the amount, extent, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations under this Order, or the security interests and liens of the DIP Lender in respect thereof; or (ii) the investigation (including discovery proceedings), assertion, initiation  or prosecution of any other claims, causes of action, adversary proceedings or other litigation against the DIP Lender. |
| **Automatic Stay** | The Interim Order vacates and modifies the automatic stay to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuation of any Event of Default, and upon five (5) business days' written notice to the Debtors, the U.S. Trustee and counsel to the Committee (if any), to exercise all rights and remedies of the DIP Lender provided for in this Interim Order, or applicable law, including, without limitation:  (A) terminating the DIP Loan; (B) charging default interest on the DIP Loan; (C) declaring all or any portion of the DIP Loan to be due and payable; and (D) subject to the Carve-Out and the Permitted Senior Liens, realizing on any or all Collateral and exercise any and all remedies, including enforcement of the Debtors' obligations regarding the orderly liquidation of the Collateral. |
| **Waivers and Consents** | Subject only to and effective upon entry of the Final Order, no expenses of administration shall be charged against or recovered from the Collateral under section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender. |

## Basis for Relief

**A.    The Debtors Should Be Authorized to Obtain the DIP Financing Facility Under Section 364 of the Bankruptcy Code**

11.    The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and, in return, to grant superpriority administrative status and liens on its property. Specifically, section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c). Further, section 364(d) of the Bankruptcy Code provides:

> (1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A)    the trustee is unable to obtain such credit otherwise; and
> >
> > (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)    In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

12.    Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g., In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

13.     Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by the proposed post-Petition Date facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

13.     Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Financing Facility. The Debtors exercised proper business judgment in securing DIP Financing Facility on terms that are fair, reasonable and the best available to them in the current market. Moreover, the Debtors were not otherwise able to obtain credit on an unsecured or administrative expense basis. For all the reasons discussed further below, therefore, the Court should grant the Debtors' request to enter into the DIP Financing Facility pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### i.   The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing Facility

14.     Based on the facts of these Cases, the DIP Financing Facility represents a proper exercise of the Debtors' business judgment. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. *Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

15.     In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513–14 (footnote omitted).

16.     To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS

2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

17.    Here, the Debtors have exercised sound business judgment in determining that the DIP Financing Facility is appropriate. This DIP Financing Facility will allow the Debtors to continue business operations; without the DIP Financing Facility, the Debtors would be forced to cease operations and liquidate. The Debtors' decision is therefore sound and reasonable under the circumstances. The terms of the DIP Financing Facility are also fair and reasonable in light of current market conditions. The DIP Financing Facility offers the best of the financing options available to the Debtors.

### ii.    The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Post-Petition Date Financing on a Senior Secured and Superpriority Basis

18.    Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain post-petition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

19.    Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;
(b)    the credit transaction is necessary to preserve the assets of the estate; and
(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

20.    In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when time is of the essence. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

21.    Here, the Debtors have used reasonable, good faith efforts to try to obtain credit other than on a secured superpriority basis. Prior to entering into Chapter 11, the Debtors conducted arm's length, good faith negotiations with these lenders on the terms of their post-

Petition Date financing. However, given the Debtors' operational difficulties, the Debtors were unable to solicit any viable proposals that authorized financing on an unsecured or administrative expense basis. On the contrary, the Debtors' negotiations with lenders made clear that the Debtors could only obtain the financing necessary to preserve their estates if they extended superpriority to these obligations.

22.    The Court should therefore authorize the Debtors to provide the DIP Lender superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code.

### iii.    The Debtors Should Be Authorized to Obtain Post-Petition Date Financing Secured by Liens that are Senior to the Liens Securing the Prepetition Credit Agreement

23.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain post-petition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

24.    Based on a review of the Debtors' records and of pertinent UCC filings, the Debtors believe that there are the following potentially secured claims:[4]

| Debtor | Creditor | Amount | Collateral | Date of Filing |
|---|---|---|---|---|
| IBCS Mining, Inc., Kentucky Division | Wells Fargo | $250,000 | Surface Coal | 6/29/2009 |
| | Norshield Security Products, LLC | $291,000 | Dominion Contract | 11/14/2012 |
| | BB&T | $1.5 Million | Blanket lien on all assets | 3/26/2013 |
| IBCS Mining, Inc. | Norshield Security Products, LLC | $291,000 | Dominion contract | 11/13/2012 |
| | People's United Equipment Finance Corp. | $975,000 | Blanket lien on all assets | 3/20/2013 |
| | BB&T | $1.5 Million | Dominion contract | 3/29/2013 |
| | Virginia Community Bank | $1.1 Million | Limited interest in Dominion contract | 8/26/2013 |

---

[4]    This is merely an estimate.  Nothing herein shall prevent the Debtors from challenging the validity, priority, or extent of these debts.

The Debtors believe that there may also be several creditors secured by purchase-money security agreements. However, pursuant to the Interim Order, these purchase-money secured creditors are not affected by the priming liens.

25.    When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);
- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;
- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and
- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

See, e.g., *Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

25.    The DIP Financing Facility satisfies each of these factors. First, the Debtors and their advisors explored a variety of possible financing sources, and only received one competitive financing proposal. The Debtors conducted arm's-length negotiations with the DIP Lender, and the ultimate agreement reflects the most favorable terms on which the Debtors were able to obtain financing. The Debtors are not able to obtain financing on equal or better terms from the DIP Lender, or any other source, without granting liens senior in priority to pre-Petition Date liens.

26.    Second, the Debtors need the funds to be provided under the DIP Financing Facility to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Financing Facility, the Debtors will be unable to operate their businesses or prosecute these Cases. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Cases is in the best interests of all stakeholders.

27.    Third, the terms of the DIP Financing Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases, as the DIP Financing Facility will allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these Cases.

28.    Fourth, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment. The DIP Financing Facility is on the most favorable terms available to the Debtors in the current market. In light of all these factors, therefore, it is clear that the Debtors should be authorized to secure the DIP Financing Facility with liens senior in priority to those securing the Prepetition Credit Agreement.

### iv.    The Interests of the Prepetition Secured Creditors Are Adequately Protected

29.    A debtor may obtain post-petition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195

B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted). The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

30.    To account for any potential diminution in value in the event that the Prepetition Secured Creditors are disgorged of the proceeds of the DIP Financing Facility, yet continue to hold valid, enforceable liens on the Prepetition Collateral, the Debtors will provide adequate protection to the Prepetition Secured Creditors in the form of section 507(b) claims and replacement liens upon all Collateral. This form of adequate protection is fair, reasonable, and sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

31.    The Debtors further reserve the right to provide evidence and/or testimony at any and all hearings on this Motion regarding the valuation of the Prepetition Secured Creditors' collateral and any corresponding equity cushion that may also be available as adequate protection to the Prepetition Secured Creditors.

32.    Further, bankruptcy courts in Virginia have approved similar forms of adequate protection for prepetition secured lenders. *See, e.g., In re AMF Bowling Worldwide, Inc.*, Case

No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 12, 2012) (granting, *inter alia*, first and second lien adequate protection liens); *In re Bear Island Paper Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 31, 2010) (granting, *inter alia*, adequate protection liens and claim pursuant to 507(b) to prepetition lenders); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re NewPage Corp.*, Case No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

33.    Accordingly, the Court should find that the adequate protection provided to the Prepetition Secured Creditors is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.    The Debtors Should Be Authorized to Use the Cash Collateral**

33.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> 
> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].
> (C)

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

34.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral. The Debtors will provide the Prepetition Secured Creditors with replacement liens on the Prepetition Secured Creditors' collateral,

including Cash Collateral, in the event the Prepetition Secured Creditors are disgorged of the proceeds of the DIP Financing Facility, yet continue to hold valid, enforceable liens on the Prepetition Collateral. The interests of the Prepetition Secured Creditors are thus adequately protected from diminution under the DIP Financing Facility. Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### D.        The Scope of the Carve-Out Is Appropriate

35.    The DIP Financing Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115 B.R. at 40. The DIP Financing Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors and the future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing Facility. Courts in Virginia and others routinely approve of carve-outs agreed to by the debtors and their DIP lenders. *See, e.g.*, *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Bear Island Paper Co., L.L.C.*, Case No 10-31202 (DOT) (Bankr. E.D. Va. Mar. 31, 2010); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-

24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Quebecor World (USA) Inc.*, Case No. 08-

10152 (JMP) (Bankr. S.D.N.Y. Jan. 23, 2008); *In re Delphi Corp.*, Case No. 05-44481 (RDD)

(Bankr. S.D.N.Y. Oct 12, 2005); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr.

S.D.N.Y. Oct 6, 2005).

### E.    The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)

36.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

37.    As explained in detail herein, the DIP Documents are the result of the Debtors'

reasonable and informed determination that the DIP Lender offered the most favorable terms on

which to obtain needed post-petition financing, and of extended arm's-length, good faith

negotiations between the Debtors and the DIP Lendes. The terms and conditions of the DIP

Documents are fair and reasonable, and the proceeds of the DIP Financing Facility will be used

only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is

being provided to any party to the DIP Documents other than as described herein. Accordingly,

the Court should find that the DIP Lender is a "good faith" lender within the meaning of section

364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**F.**      **Modification of the Automatic Stay Is Warranted for the DIP Lender**

38.      The DIP Documents and the Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court.

39.      Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Roomstore, Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re Canal Corp. f/k/a Chesapeake Corp.*, Case No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008); *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012).

**G.      The Debtors Require Immediate Access to the DIP Financing Facility**

40.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

41.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $2 million under the DIP Financing Facility, is not granted promptly after the Petition Date. The Debtors have insufficient cash to meet their debt obligations and fund operations without immediate access to the DIP Financing Facility. Further, the Debtors anticipate that the commencement of these Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with domestic and foreign customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest.

42.     The importance of a debtor's ability to secure post-petition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district and others in similar circumstances. *See, e.g., In re Va. United Methodist Homes of Williamsburg, Inc.*, Case No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (order approving post-petition financing on an interim basis); *In re AMF Bowling Worldwide, Inc.*, Case No. 12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re Roomstore, Inc.*, Case No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper Co., L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Canal Corp. f/k/a Chesapeake Corp.*, Case No. 08-36642 (DOT) (Bankr. E.D. Va. Bankr. Dec. 30, 2008) (same); *In re Circuit City Stores,*

*Inc.*, Case No. 08-35653 (KRH) (Bankr. E.D. Va. Nov. 10, 2008) (same); *In re Patriot Coal Corp.*, Case No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same). Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

H.    **Request for Final Hearing**

43.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 30 days from the entry of the Interim Order as the Final Hearing.

44.    The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## Request for Waiver of Stay

45.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Financing Facility is essential to prevent irreparable damage to the Debtors' operations and enterprise value. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## Notice

46.     No trustee, examiner or creditors' committee has been appointed in these Cases. The Debtors have served notice of this Motion and the Interim Hearing on (a) the Office of the United States Trustee for the Western District of Virginia (the "**U.S. Trustee**"); (b) the attorneys for the Debtors' proposed DIP Lender; (c) those creditors holding secured claims against the Debtors' estates; (d) those creditors holding the twenty largest unsecured claims against the Debtors' estates; (e) the Internal Revenue Service; and (f) the United States Environmental Protection Agency (collectively, the "**Notice Parties**"). All of the Notice Parties were served via overnight mail or fax, as well as via email where available. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that further notice of this Motion is neither required nor necessary.

## No Previous Request

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: July 2, 2014

Respectfully submitted,

/s/  Robert S. Westermann

Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  (804) 771-9500
Facsimile:   (804) 644-0957
E-mail: rwestermann@hf-law.com
           rgreenleaf@hf-law.com

*Proposed Counsel for the Debtors*