## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Lynchburg Division

| | |
|---|---|
| In re:<br><br>IBCS Mining, Inc., et al.[1]<br><br>Debtor. | Chapter 11<br>Case No. 14-61215<br>Jointly Administered |

**FINAL ORDER AUTHORIZING DEBTORS TO (A) OBTAIN SECURED POST-PETITION DATE FINANCING PURSUANT TO SECTIONS 105, 361, 362, 363, 364(c) AND 364(d) OF THE BANKRUPTCY CODE, AND (B) UTILIZE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE**

THIS MATTER having been opened to the Court by IBCS Mining, Inc. ("**IBCS**") and IBCS Mining, Inc., Kentucky Division, ("**IBCS Kentucky**") the within debtors and debtors-in-possession (collectively, the "**Debtors**", or individually, a "**Debtor**"), by and through their counsel, Hirschler Fleischer, P.C., upon an amended motion (the "**Motion**"), pursuant to sections 105, 361, 362, 363, 364(c), and 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the corresponding Local Rules for the United States Bankruptcy Court for the Western District of Virginia (the "**Local Rules**") seeking, among other things:

> (1)    authorization for the Debtors to obtain senior secured debtor-in-possession, post-petition financing from Community Trust Bank, Inc. (the "**DIP Lender**") consisting of a $1.5 million term loan secured by a first lien on all assets (other than certain equipment in which certain pre-petition secured lenders have purchase money security

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  IBCS Mining, Inc., (8425) and IBCS Mining, Inc., Kentucky Division (8711).  The location of the Debtors' service address is 944 Glen Wood Station Lane, Suite 101, Charlottesville, Virginia 22901.

Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:      804.771.9500
Facsimile:      804.644.0957
E-mail:  rwestermann@hf-law.com
              rgreenleaf@hf-law.com

*Counsel for the Debtors*

interests) of the Debtors (the "**DIP Loan**"), on the terms contained within this Order, the Term Sheet attached as <u>Exhibit 1</u> (the "**Term Sheet**") and pursuant to the amended budget attached hereto as <u>Exhibit 2</u> (the "**Budget**");

> (2)    authorization for the Debtors to use the DIP Lender's cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) (the "**Cash Collateral**");

> (3)    the prohibition of any right to surcharge against the Collateral under section 506(c) of the Bankruptcy Code;

> (4)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") be held on the Motion to consider the entry of the Interim Order, among other things, (a) authorizing the Debtors, on an interim basis, to borrow up to an aggregate principal amount not to exceed $1.5 million, and (b) authorizing the Debtors' use of Cash Collateral on an interim basis;

> (5)    the scheduling of a final hearing (the "**Final Hearing**") on August 20, 2014, at 11:00 a.m. to consider entry of a final order (the "**Final Order**"); and

> (6)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order, this Final Order, the Term Sheet and the DIP Loan Documents (defined below).

The Debtors had filed a previous motion to approve debtor-in-possession financing (the "**Original DIP Motion**"). Objections to the Original DIP Motion were filed by Branch Banking and Trust Company ("**BB&T**") and Wells Fargo Bank Northwest, N.A., as Indenture Trustee ("**Wells Fargo**"). People's United Equipment Finance Corp. ("**People's United**"), although not filing an objection, also raised issues with the Original DIP Motion. The Objections of BB&T and Wells Fargo were initially resolved through the provisions of the Interim Order. Objections to the entry of this Final Order were timely filed by BB&T and have been resolved through the provisions of this Final Order. The Court having found that, under the circumstances, due and sufficient notice of the Motion, the Interim Hearing, and the Final Hearing was provided by the Debtors as set forth in paragraph 3 below, and the Court having held the Interim Hearing on July 23, 2014; and upon the entire record made at the Interim Hearing; and upon the record made at the hearing on the Original DIP Motion regarding agreements by and among the Debtors and BB&T and Wells Fargo resolving their respective objections; and upon the Interim Order entered by the Court on July 25, 2014 [Docket No. 114] (the "**Interim Order**"); and the Court having held the Final Hearing on August 20, 2014; and upon the entire record made at the Final Hearing; and upon the entire record of the Debtors' chapter 11 cases (the "**Bankruptcy Cases**"); and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.  *Disposition.* The Motion is granted on a final basis on the terms set forth in this Order, the Term Sheet and the DIP Loan Documents (defined below).  The objections to the Original DIP Motion of BB&T and Wells Fargo as well as the issues raised by People's United with respect to the Original DIP Motion are resolved on the terms hereinafter set forth. Any other objections to the relief sought in the Motion, and any reservations of rights with respect to such relief that have not been previously resolved or withdrawn are overruled on the merits.  This Final Order shall be valid, binding and enforceable on all parties in interest and fully effective immediately upon entry.

2.  *Commencement of the Bankruptcy Cases, Jurisdiction and Venue.*  On June 27, 2014 (the "**Petition Date**"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Court approved the appointment of David Stetson as Chief Restructuring Officer of the Debtors (the "**CRO**") [DE # 61].  This Court has jurisdiction over the Bankruptcy Cases and the Motion as a core proceeding, and over the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  No request has been made for the appointment of a trustee or examiner and an unsecured creditors' committee was appointed on July 17, 2014 [DE #84].

3.  *Notice.*  Notice of the Motion, the Interim Hearing, the proposed entry of the Interim Order, and the Final Hearing has been provided by regular mail or e-mail to:  (i) the Debtors' twenty (20) largest unsecured creditors; (ii) the Office of the United States Trustee for the Western District of Virginia (the "**U.S. Trustee**"); (iii) counsel to the DIP Lender; (iv) each of the Pre-petition Secured Lenders (defined as the creditors listed in paragraph 29 of the Motion); (v) each of the PMSI Creditors (as defined below); (vi) the Internal Revenue Service and other government agencies to the extent required by the Bankruptcy Rules and Local Rules; (vii) the committee of unsecured creditors appointed in these cases; and (viii) each of the Debtors' banks.  Under the circumstances, the notice given by the Debtors of the Motion, the Interim Hearing, the entry of the Interim Order, the Final Hearing, and this Final Order constitutes appropriate, due and sufficient notice thereof and complies with sections 102(1), 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001(b) and (c) and the Local Rules of this Court, and no other notice need be provided for entry of this Final Order.

4.  *Pre-Petition Secured Debt.* The Debtors' pre-petition secured debt obligations, as more fully discussed in the Motion, are incorporated herein by reference.  Nothing herein shall foreclose a challenge to the validity, priority, or extent of such pre-petition secured debt.  Finally, certain purchase money lenders (collectively, the "**PMSI Creditors**") may assert purchase money security interests against a variety of miscellaneous equipment used by the Debtors (collectively, the "**PMSI Collateral**").

5.  *Efforts to Find Financing.*  Despite good faith efforts, the Debtors are unable to obtain (i) adequate unsecured credit allowed under sections 503(b)(1) or 364(c)(1) of the Bankruptcy Code as an ordinary administrative expense, (ii) unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code, or (iii) secured credit protected solely under

section 364(c) of the Bankruptcy Code from any source sufficient for the Debtors to continue their business operations. The Debtors are also unable to obtain financing without (i) granting priority under 11 U.S.C. § 364(c)(1) and also priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, (ii) securing the post-petition obligations with liens on substantially all of the Debtors' assets in accordance with Section 364(c)(2) of the Bankruptcy Code, (iii) securing the post-petition obligations with junior liens on the PMSI Collateral in accordance with section 364(c)(3) of the Bankruptcy Code, and (iv) securing the post-petition obligations with senior liens on all other assets of the Debtors in accordance with section 364(d) of the Bankruptcy Code.

      6.    *Findings Regarding the DIP Loan.*

      (a)    Good cause has been shown for the entry of the Interim Order and for this Final Order.

      (b)    The Debtors have an immediate need to obtain the DIP Loan and use Cash Collateral in order to, among other things and in accordance with the Budget (subject to permitted variances), permit the orderly continuation of the operation of their businesses, to pay for working capital needs, and to pay administrative expenses of the Bankruptcy Cases. The access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness pursuant to the DIP Loan and use of Cash Collateral is vital to the Debtors' sale efforts and the preservation and maintenance of the going concern values of the Debtors.

      (c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lender under the terms of this Final Order, the Term Sheet and the DIP Loan Documents (defined below).

      (d)    The DIP Lender has consented to the Debtors' use of Cash Collateral on the terms set forth in this Final Order. To the extent that Cash Collateral is encumbered by the Pre-petition Secured Lenders, such Pre-petition Secured Lenders are receiving adequate protection for use of the Cash Collateral and such is ordered pursuant to section 363(c) of the Bankruptcy Code.

      (e)    Based on the record presented to the Court at the July 7, 2014 hearing on the Original DIP Motion, at the Interim Hearing, and at the Final Hearing, the terms of the DIP Loan and the use of Cash Collateral under the terms and conditions set forth in this Final Order, the Term Sheet and the DIP Loan Documents (defined below) are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and the DIP Loan and the DIP Lender's consent to use of Cash Collateral constitute reasonably equivalent value and fair consideration for the Debtors' incurrence of indebtedness under the DIP Loan.

      (f)    Based on the record presented to the Court at the July 7, 2014 hearing on the Original DIP Motion, Interim Hearing, and the Final Hearing, any parties entitled to adequate protection under section 364 of the Bankruptcy Code, including the Pre-petition Secured Lenders, have been provided adequate protection. Further, any adequate protection required under section 364(d)(1)(B) of the Bankruptcy Code has been provided.

(g)    The terms of the DIP Loan and terms of use of Cash Collateral have been negotiated in "good faith," as that term is used in section 364(e) of the Bankruptcy Code, and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations, liabilities and indebtedness of whatever kind, nature or description arising under, in respect of or in connection with the DIP Loan (such obligations and indebtedness, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender and the DIP Loan shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(h)    The Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed. Immediate consummation of the DIP Loan and authorization of the Debtors' use of Cash Collateral in accordance with this Final Order, the Term Sheet and the DIP Loan Documents (defined below) is therefore in the best interests of the Debtors' estates.

7.    *Authorization of the DIP Loan.*

(a)    The DIP Lender is authorized to make the DIP Loan on the terms provided in the Interim Order, this Final Order, the Term Sheet and any other post-petition loan documents and credit agreements reasonably requested by the DIP Lender (collectively, the "**DIP Loan Documents**").   The Debtors are hereby authorized to borrow money and incur indebtedness in accordance with the terms and conditions of this Order, the Term Sheet, and the DIP Loan Documents, up to an aggregate principal or face amount of $1.5 million, plus interest, fees and other expenses and amounts provided for in this Order, the Term Sheet and the DIP Loan Documents, in accordance with advances approved by the DIP Lender in compliance with the Budget, and such advances to conform strictly to the Budget until the Debtors have satisfied all conditions precedent to the Dominion Amendment (as defined below).  Such borrowings shall only be used for the purposes permitted under this Order, including to pay for (i) such working capital needs of the Borrower solely as provided in the Budget (subject to permitted variances), (ii) administrative expenses incurred in the ordinary course of Debtors' operations during the Bankruptcy Cases, and (iii) other costs and expenses associated with negotiating and closing the DIP Loan and transactions contemplated by the DIP Loan, including reimbursement of costs incurred by the DIP Lender in each case solely to the extent permitted by the Budget and this Order.  David Stetson or Michael Dean are authorized to request such advances on behalf of the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Loan, including, without limitation:

(i)      the payment to the DIP Lender of the fees referred to in this Order, and reasonable costs and expenses as may be due from time to time, including, without limitation, the Loan Fees and the Lender Expenses (each as defined below); and

(ii)     the performance of all other acts required under or in connection with the DIP Loan, including such acts, waivers and cooperation required of the Debtors pursuant to the DIP Loan after the occurrence of an Event of Default (as defined below).

(c)      Upon entry of the Interim Order, the DIP Loan constituted valid and binding joint and several obligations of each of the Debtors, enforceable against each Debtor in accordance with the terms thereof.  No obligation, payment, transfer or grant of security under the Interim Order, this Final Order, the Term Sheet, and the DIP Loan Documents shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim, or be deemed an avoidable post-petition transfer under section 549 of the Bankruptcy Code.

8.      *The DIP Loan Terms*.  The DIP Lender is authorized to make the DIP Loan on the terms provided in the Interim Order, this Final Order, the Term Sheet and the DIP Loan Documents.  The DIP Loan will be made on the following terms:

(a)      The DIP Lender, in its sole discretion, will provide a term loan to the Debtors in an amount up to $1,500,000, minus the Reserves (as defined below).

(b)      Notwithstanding any other provision of the Interim Order, this Final Order, the Term Sheet or the DIP Loan Documents, the DIP Lender shall not have any obligation or commitment to make any DIP Loans pursuant to the Interim Order, this Final Order or the Term Sheet until the conditions precedent provided for herein and therein have been satisfied.

(c)      The DIP Loan is conditioned upon: (i) entry of the Interim Order, in a form acceptable to DIP Lender in its sole discretion (which occurred on July 25, 2014); (ii) David Stetson continuing to be retained as the Chief Restructuring Officer of the Debtors pursuant to this Court's Order; (iii) Ed Scarborough having no managerial, financial, or executive authority or responsibility at either Debtor; (iv) the Debtors and Dominion entering into an amendment of the Dominion Contract (the "**Dominion Amendment**"), all in a form acceptable to DIP Lender in the DIP Lender's sole discretion and approved by the Bankruptcy Court; and (v) Debtors have entered into an agreement with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (collectively, the "**Bidders**") wherein the Bidders agree to offer a minimum of $▮▮▮▮▮▮ to the Company for substantially all of its assets in a form acceptable to DIP Lender in the DIP Lender's sole discretion.

(d)      The DIP Loan shall be secured by a first lien on the Collateral (defined below) in all respects unless otherwise provided in this Order.

(e)    "**Collateral**" means all property and interests in property of the Debtors arising, acquired or created before or after the Petition Date, including, without limitation, (i) all accounts, accounts receivable, and general intangibles (including patents, trademarks, patent applications, copyrights and other intellectual property of whatever description, commercial tort claims, royalty payments such as under patent, trademark or other licensing arrangements, proceeds of condemnation awards, proceeds of judgments; (ii) all inventory including, but not limited to, Garbage Off Bituminous coal, as extracted coal, raw materials, work in process, finished goods and materials used or usable in the manufacturing, processing, packaging or shipping of inventory; (iii) all returned goods and merchandise relating to accounts and accounts receivable; (iv) all equipment including, but not limited to, machinery, fixtures, furniture and all accessories, fittings and parts therefore; (v) all documents, instruments and chattel paper; (vi) all fixtures; (vii) all books and records of each Debtor including books and records evidencing, securing or relating to accounts and accounts receivable; (viii) all securities, stocks, options, and warrants, whether certificated or uncertificated and whether in bearer or registered form, if any (provided, however, that the security interest in and lien on the equity interests owned by a Debtor in any entity organized outside of the United States shall be limited); (ix) all tax refunds arising from taxes incurred and paid on or after the Petition Date; (x) all real estate or interests in real estate, including all coal, gas and mineral rights attached thereto; and (xi) all proceeds, products, profits and rents of any of the foregoing.  Notwithstanding the foregoing, the Collateral does not include any judgments or proceeds of a cause of action against any person or entity arising under Chapter 5 of the Code ("**Avoidance Actions**").

(f)    "**Reserves**" means reserves imposed from time-to-time by DIP Lender in its reasonable discretion, including reserves for any adequate protection payments to the Pre-petition Secured Lenders (defined in the Motion) or for Lender Expenses (as defined below) on which the parties agree and/or the Court otherwise orders.

(g)    The DIP Loan shall accrue interest at the rate of Wall Street Journal Prime plus 4% (with a floor of 7.5%) per annum on the outstanding day-to-day principal balance.

(h)    From and after an Event of Default (defined below), the DIP Loan shall accrue interest at three percent (3%) per annum above the otherwise applicable interest rates.

(i)    Beginning September 1, 2014, interest on the DIP Loan shall be due and payable on the first business day of each month in arrears and all interest will be calculated based on a 360 day year.

(j)    The Debtors shall pay the DIP Lender a non-refundable facility fee of $80,000, of which $40,000 (the "**Approval Date Closing Fee**") became payable upon the entry of the Interim Order and was paid by the Debtors to the DIP Lender, and $40,000 will be due on Maturity Date (defined below) (the "**DIP Closing Fee**", and together with the Approval Date Closing Fee, the "**Closing Fee**").  The DIP Closing Fee shall be escrowed by the DIP Lender from the DIP Loan for payment upon the Maturity Date.

(k)    The Debtors shall pay the DIP Lender, upon demand, all reasonable fees and out-of-pocket costs and expenses incurred by DIP Lender after the Petition Date in monitoring, administering or providing financing or enforcing its rights and remedies hereunder,

including without limitation, attorneys' fees and costs, costs and fees associated with Bankruptcy Court appearances, all liquidation costs (including a reasonable allocation of internal costs and expenses arising as a result of any liquidation), appraisal fees, environmental audits, recording fees, field audit fees (at a rate of $1,000 per man/day plus out-of-pocket expenses), expert witness fees, together with all expenses and fees (including attorneys' fees and costs) incurred in connection with any litigation arising under or in connection with this Order or in connection with or related to the financing being provided hereunder, including the costs of defending any litigation with any  account debtor, except that, notwithstanding the foregoing, the Debtors shall not be responsible for any such fees, costs and expenses caused by Lender's gross negligence or willful misconduct (collectively, the "**Lender Expenses**").  At closing of the DIP Loan, payment of all legal and advisory fees and expenses (including attorneys' fees and costs) incurred to such date by the DIP Lender in connection with the DIP Loan shall be paid by Debtors by way of advance under the DIP Loan.

9.    *Budget.*

(a)    The use of borrowings under the DIP Loan shall be limited in accordance with the Budget depicting on a weekly basis cash revenue, receipts, expenses and disbursements and other information for the first 13 weeks from the entry of the Interim Order, which shall be in form and substance acceptable to the DIP Lender and approved by the DIP Lender in its sole discretion.  The Budget shall be updated by the Debtors (in form and substance acceptable to the DIP Lender and approved by the DIP Lender in its sole discretion) not less than on a monthly basis (with delivery to the DIP Lender and to counsel for the Pre-petition Secured Lenders on or before the thirtieth (30th) day of each calendar month) and the Debtors shall be required to comply with the Budget (including any permitted variances) in all material respects for purposes of the DIP Loan.  The Budget shall be updated to reflect actual historical cash flow and expenses and so that it is at all times a forward-looking rolling 13-week Budget.  Upon the completion of each weekly period, the Debtors shall deliver a variance analysis to the DIP Lender, which shall be acceptable to the DIP Lender, with respect to all items from the most recently completed weekly period.  The Budget may only be modified by the written agreement of the Debtors and the DIP Lender, with prior written notice to this Court and the Office of the United States Trustee.

(b)    The Debtors shall not (i) pay any expenses other than those set forth in the Budget; provided, however, expenses may exceed particular line items in the Budget by no more than 10% for a particular week so long as the aggregate weekly expenses for all line items does not exceed the total weekly amount of expenses set forth in the Budget by 10%, or (ii) permit net cash flow to be less than 80% of the projected net cash flows under the Budget on a cumulative basis.  The Debtors shall deliver by 2:00 p.m. (Eastern) on Tuesday of each week to the DIP Lender and to counsel for the Pre-petition Secured Lenders, reconciliation for the prior week and cumulative from the entry of this Order of actual expenses to the amounts set forth in the Budget for such periods.

10.    *Cash Management Controls.*  The Debtors shall enter into cash management controls satisfactory to DIP Lender, including lockbox, concentration and blocked account agreements (as appropriate). The Debtors shall set up DIP bank accounts with the DIP Lender.

11.    *Maturity*. The DIP Loan shall be due on the earliest of: (i) December 15, 2014; (ii) the occurrence of an Event of Default (defined below); (iii) the closing of a sale pursuant to an Order authorizing a sale of all or substantially all of the Debtors' assets; or (iv) the effective date of any confirmed plan of reorganization (the "**Maturity Date**"). Confirmation of any plan shall not discharge or otherwise affect in any way any of the joint and several obligations of the Debtors under the DIP Loan, other than after the payment in full in cash of such obligations on or before the effective date of a chapter 11 plan.

12.    *Superpriority Claims*. To secure the prompt payment and performance of all of the DIP Obligations, all of the DIP Obligations, including but not limited to all principal, accrued interest, fees, costs and expenses, shall constitute allowed administrative expense claims against the Debtors, and pursuant to section 364(c)(1) of the Bankruptcy Code shall have priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof.

13.    *DIP Liens*. As security for the DIP Obligations, including but not limited to all principal, accrued interest, fees, costs and expenses, effective and perfected upon the entry of the Interim Order and without the necessity of the execution, recordation of filings by the Debtors or the DIP Lender of mortgages, security agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Lender of any Collateral, including cash, the DIP Lender shall receive, and is granted by the Debtors, the following fully-perfected liens on and security interests in the Collateral, subject only to valid, perfected, unavoidable and enforceable purchase money security interests of the PMSI Creditors ("**Permitted Senior Liens**") (all such liens and security interests granted to the DIP Lender in the Collateral pursuant to the Interim Order and this Final Order, collectively, the "**DIP Liens**"):

(a)    First-Priority Lien on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, unavoidable, continuing, enforceable, fully-perfected first-priority senior security interest in and lien upon the Collateral which is not subject to valid, perfected, unavoidable and enforceable liens, excluding solely Avoidance Actions.

(b)    Liens Junior to Permitted Senior Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, unavoidable, continuing, enforceable, fully-perfected security interest in and lien upon all Collateral subject to Permitted Senior Liens which liens in favor of the DIP Lender are immediately junior to such Permitted Senior Liens.

(c)    Liens Senior to All Other Liens. Other than the Permitted Senior Liens identified above in subsection (b), the DIP Liens shall be valid, binding, unavoidable, continuing, enforceable, fully-perfected security interests in and first priority priming liens under section 364(d) of the Bankruptcy Code on the Collateral. Further, the DIP Liens shall not be (a) subject

9

or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, subject to and effective upon entry of this Final Order, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (b) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

    14.    *Protection of DIP Lender's Rights.*

    (a)    All Collateral shall be free and clear of all senior liens, claims and encumbrances, except for the Permitted Senior Liens and nothing in this Final Order shall prime or otherwise subordinate the liens held by People's United with respect to any equipment collateral to the extent such liens are otherwise valid, perfected, unavoidable and enforceable purchase money security interests.

    (b)    Notwithstanding section 362 of the Bankruptcy Code, without further order or application to the Court, the automatic stay is hereby vacated and modified to the extent necessary to permit the DIP Lender, upon the occurrence and during the continuation of any Event of Default, and upon five (5) days' written notice to the Debtors, the U.S. Trustee, counsel to the Committee (if any), and counsel for the Pre-petition Secured Lenders to exercise all rights and remedies of the DIP Lender provided for in this Final Order, the DIP Loan Documents, or applicable law, including, without limitation: (A) terminating the DIP Loan; (B) charging default interest on the DIP Loan; (C) declaring all or any portion of the DIP Loan to be due and payable; (D) subject to the Permitted Senior Liens, realizing on any or all Collateral and exercise any and all remedies, including enforcement of the Debtors' obligations regarding the orderly liquidation of the Collateral; and (E) terminating consent to use Cash Collateral. If applicable, the DIP Lender is hereby granted relief from the automatic stay to allow the DIP Lender to apply the proceeds of accounts receivable or the Collateral to the DIP Obligations.

    (c)    In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The failure of the DIP Lender to seek relief or otherwise exercise or enforce its rights and remedies under the Interim Order, this Final Order, the Term Sheet or the DIP Loan Documents shall not constitute a waiver of the DIP Lender's rights or remedies hereunder, thereunder or otherwise.

    (d)    The Debtors are hereby authorized to pay upon demand the Loan Fees and the Lender Expenses. None of such fees, costs, expenses or other amounts shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that the Court shall have jurisdiction to determine any dispute concerning such demand for payment raised within ten (10) business days after demand for payment. Any such objection or any part thereof, not set forth in writing to the DIP Lender within ten (10) business days after demand for payment shall be deemed irrevocably waived. All such unpaid fees, costs, expenses and other amounts owed or payable shall be secured by the Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order.

15.    *No Other Lien or Claim.*  No other claim or lien having a priority superior or *pari passu* with those granted by the Interim Order or by this Final Order to the DIP Lender shall be granted while any portion of the DIP Obligations remain outstanding.  Except as set forth in this Order, none of the DIP Lender's liens, mortgages or security interests shall be subject or subordinate to (a) any lien or claim under sections 363 or 364 of the Bankruptcy Code or otherwise, or (b) any liens arising after the Petition Date.

16.    *Adequate Protection to Pre-petition Secured Lenders.*   No payments of principal or interest will be made by the Debtors on account of any obligations owing to third parties, whether secured by pre-petition encumbered collateral owned by Debtors or not, as long as any amount is outstanding to the DIP Lender under the DIP Loan, except as expressly set forth below:

(a)    Wells Fargo.  Prior to August 30, 2014, IBCS Kentucky shall open a segregated demand deposit account, initially funded with a ten thousand dollar ($10,000) deposit (the "**Wells Fargo Cash Collateral Account**").  The lien of Wells Fargo shall attach to the Wells Fargo Cash Collateral Account with the same priority, extent, and validity as the Wells Fargo lien attached pre-petition to the waste or "GOB" coal pile of IBCS Kentucky.  The lien of the DIP Lender is subordinate to the lien of Wells Fargo in and to the Wells Fargo Cash Collateral Account.  The lien of Wells Fargo in and to the Wells Fargo Cash Collateral Account shall be deemed perfected without documentation, action, or filing by Wells Fargo.  Prior to September 30, 2014, IBCS Kentucky shall make an additional deposit of five thousand dollars ($5,000) to the Wells Fargo Cash Collateral Account.  IBCS Kentucky shall make additional deposits of twenty-five thousand dollars ($25,000) to the Wells Fargo Cash Collateral Account prior to the end of each month subsequent to September, 2014.

(b)    BB&T.  As adequate protection for use of surface or waste coal subject to BB&T', on or before August 30, 2014, the Debtors shall pay to BB&T, via wire transfer, ten thousand dollars ($10,000).  On or before September 30, 2014, the Debtors shall pay to BB&T, via wire transfer, five thousand dollars ($5,000).  On or before the last day in each subsequent month, the Debtors shall pay to BB&T, via wire transfer, twenty-five thousand dollars ($25,000).  As adequate protection for use of as-extracted coal, on or before September 30, 2014 and on the date of each adequate protection payment thereafter, the Debtors shall pay to BB&T, via wire transfer, an amount to be determined jointly by the Debtors and BB&T based on the amount of as-extracted coal utilized by the Debtors for such period and available cash from the "other" category contained in the Budget.  In the event the parties cannot agree with respect to the amount of an adequate protection payment, a motion can be filed seeking a determination from the Court as to the appropriate amount.  To the extent adequate protection payments are made to BB&T for use of as-extracted coal, the Budget is deemed to be modified accordingly.

(c)    People's United.  Starting August 30, 2014, and on the last day of each subsequent month, IBCS shall pay to People's United twenty-three thousand two hundred fifty-three dollars ($23,253) via wire transfer which amount represents post-petition usage by the Debtors and adequate protection for the equipment in which People's United has a purported lien; provided, however, IBCS and People's United may agree to reduce this amount to the extent IBCS relinquishes and turns over possession of any equipment collateral.  To the extent

any equipment collateral subject to a Permitted Senior Lien is relinquished and turned over to People's United, no further order or relief shall be required.

(d)    General.  In addition to the foregoing, all Pre-petition Secured Lenders (including Wells Fargo, BB&T, and People's United) shall receive adequate protection in the form of section 507(b) administrative claims and replacement liens in the same priority, extent, and validity as existed prior to the Petition Date subject to the liens granted herein to the DIP Lender upon all Collateral to the extent of diminution of the Pre-petition Secured Lenders' respective pre-petition collateral, subject to Bankruptcy Court approval.

17.    *Reporting*.  The Debtors shall continue to provide to the Pre-petition Secured Lenders post-Petition Date the same reporting the Debtors had committed to provide to the Pre-petition Secured Lenders prior to the Petition Date.  The Debtors shall furnish to the DIP Lender, in such form and detail as the DIP Lender may reasonably request:

(a)    Weekly, aging and summary reports of accounts, accounts payable and a reconciliation of accounts, inventory and accounts payable to the Debtors' forecasts.  The Debtors shall also provide such reports to counsel for the Pre-petition Secured Lenders.

(b)    Monthly, by the thirtieth (30th) of each calendar month, a monthly compliance certificate;

(c)    Monthly, by the thirtieth (30th) of each calendar month in respect of the preceding month, an aged accounts receivable schedule, aged accounts payable schedule, detailed inventory schedule, Priority Claims listing and summary trial balance;

(d)    Monthly, by the thirtieth (30th) of each calendar month in respect of the preceding month, a balance sheet of the Debtors as of the close of each such month, and statements of income and surplus of the Debtors for each month, all in such form and detail as the DIP Lender may reasonably request;

(e)    Immediately, copies of all pleadings and reports filed by the Debtors or provided to the Office of the U.S. Trustee;

(f)    Within two business days of receipt, any notice of default of a material contract, including the Dominion Contract; and

(g)    All other reports, documents and information that the DIP Lender may reasonably request.

18.    *Insurance*.  The Debtors shall maintain adequate fire and extended coverage and liability insurance covering all of its present and future real and personal property, including the Collateral, with lender's loss payable and noncontributory mortgagee clauses in the DIP Lender's favor, protecting such interests as they may appear.  Such insurance must be in such form, with such companies, and in such amounts as is acceptable to the DIP Lender, insuring against liability for damage to persons or property, and must provide for thirty (30) days' prior written notice to the DIP Lender of cancellation or material alteration.  The Debtors must provide the DIP Lender with evidence of such policies, as soon as practicable following entry of this

12

Order, showing that the DIP Lender's interests have properly been endorsed on the applicable policy. The DIP Lender may, in its reasonable discretion, on thirty (30) days' written notice to the Debtors, require the Debtors to obtain additional or different insurance coverage as the DIP Lender may reasonably request.

19. *Access.* The DIP Lender, through its employees or agents, shall have the right at any time or times upon reasonable notice to the Debtors and during the Debtors' usual business hours, or during the usual business hours of any third party having control over any of the Debtors' records, to inspect such records in order to verify the amount or condition of, or any other matter relating to, the Collateral or the Debtors' financial condition. The DIP Lender also shall have the right at any time or times upon reasonable notice to the Debtors and during the Debtors' usual business hours to inspect and examine inventory and all other Collateral. Notwithstanding anything herein to the contrary, the DIP Lender's actions under this paragraph shall not unreasonably interfere with the Debtors' business operations; provided, however, if an Event of Default has occurred and is continuing or if the DIP Lender reasonably believes that an Event of Default has occurred and is continuing and gives notice to Debtors and their counsel of such specific Event of Default, the DIP Lender may conduct any of the inspections referenced in this paragraph at any time without regard to the Debtors' or any third party's usual business hours.

20. *Indemnity.* The Debtors, and each of their equity holders, shall indemnify and hold DIP Lender and its respective officers, directors, employees and agents (including all of its professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Loan, the DIP Loan Documents, the Interim Order, the Final Order, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Loan, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

21. *Limitation on Charging Expenses Against Collateral.* Subject only to and effective upon entry of this Final Order, no expenses of administration of the Bankruptcy Cases or any future proceeding that may result therefrom, including conversion of any of the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral under section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

22. *Limitation on Uses.* No portion of the DIP Loan, the Collateral or the Cash Collateral shall be used or be available to pay any fees, disbursements, costs or expenses incurred by any party in connection with: (i) contesting, hindering or delaying the DIP Lender's enforcement of the Interim Order or this Final Order or the DIP Lender's realization upon any of the Collateral (subject to the terms of the Interim Order, this Order, the Term Sheet and the DIP

Loan Documents); (ii) challenging the amount, extent, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations under the Interim Order, this Final Order, or the security interests and liens of the DIP Lender in respect thereof; or (iii) the investigation (including discovery proceedings), assertion, initiation or prosecution of any other claims, causes of action, adversary proceedings or other litigation against the DIP Lender.

      23.    *Perfection of DIP Liens.*

      (a)    The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action (including taking or releasing any liens or pledges granted by the Interim Order or this Final Order) in order to validate and perfect the DIP Liens granted to the DIP Lender hereunder. Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien, similar instruments or take such other act that may be otherwise required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens, and, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, all such liens and security interests in the Collateral, including any liens that may be created upon any deposit accounts or securities accounts, shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, as of the date of entry of the Interim Order. The failure of the Debtors to execute any documentation relating to the enforceability, priority or perfection of the DIP Liens shall in no way affect the validity, perfection or priority of the DIP Liens.

      (b)    If the DIP Lender, in its sole discretion, elects to file any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise to confirm perfection of the DIP Liens, the Debtors shall cooperate with and assist in such process, the stay imposed under section 362 of the Bankruptcy Code is hereby lifted to permit the filing and recording of a certified copy of the Interim Order or this Final Order, or any such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all such documents shall be deemed to have been filed and/or recorded nunc pro tunc at the time of and on the date of the Interim Order. Upon the request of the DIP Lender, without any further consent of any party, the Debtors are authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens.

      (c)    A certified copy of either the Interim Order or this Final Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of either the Interim Order or this Final Order for filing and recording.

      24.    *Use of Cash Collateral.*  Subject to the terms of this Final Order, the Debtors are hereby authorized to use all Cash Collateral, solely as permitted by the Budget (subject to permitted variances), until the Maturity Date or the occurrence of an Event of Default (as defined

below).

25.    *Authority to Enter Into Letter Agreement*.   The Debtors are hereby authorized to enter into the Letter Agreement attached to the Motion as **Exhibit B**.  To the extent the Debtors are unable to obtain a higher, qualified bid, the Debtors will seek additional court approval of the offer embodied in the Letter Agreement as a stalking horse bid.

26.    *The Transaction and Milestones.*

(a)    Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any Collateral pursuant to section 363(b) of the Bankruptcy Code or otherwise (a "Disposition Event") unless all obligations owed to the DIP Lender on account of the DIP Loan, as set forth in the DIP Loan Documents, or the Interim Order or the Final Order will be indefeasibly paid in full from the proceeds of the Disposition Event or otherwise, or upon the written consent of the DIP Lender.  In the event a Disposition Event occurs as to which the DIP Lender does not receive full repayment of the DIP Loan, the DIP Lender shall have no further obligation to make post-petition Advances or other financial accommodations to Debtors and the full amount of the DIP Loan shall be immediately due to the DIP Lender.  Debtors shall not, without the consent of the DIP Lender together with an order of the Bankruptcy Court, enter into any agreement to return any assets to any of the Debtors' creditors for application against any pre-petition indebtedness under any applicable provision or section of the Bankruptcy Code, or consent to any creditor taking any setoff against any of its pre-petition indebtedness unless the DIP Lender consents in writing to such Disposition Event, and provided that any Disposition Event that is pending as of the date of the DIP Loan is subject to the prior approval of the DIP Lender.

(b)    It is the intention of the Debtors and it shall be the intention of the investment banker (if appointed) to identify a transaction pursuant to which the Debtors will sell substantially all of the saleable assets of the Debtors in one or more transactions (each, a "**Transaction**") that maximizes the value of the businesses and assets of the Debtors for the benefit of all creditors and satisfy the DIP Loan in full.

(c)    If requested by DIP Lender, the Debtors shall file an application to approve the retention of an investment banker acceptable to the DIP Lender, in form and substance satisfactory to DIP Lender, no later than 10 days after a written request from the DIP Lender.

(d)    The Debtors shall file a Motion to approve a stalking horse bid, acceptable to DIP Lender in its sole discretion, together with a bid procedures motion, acceptable to DIP Lender in its sole discretion, by September 30, 2014.

(e)    The sale of Debtors' assets shall close no later than December 15, 2014.

(f)    The Debtors and their investment banker (if applicable) shall provide the DIP Lender with all information reasonably requested by the DIP Lender, including, without limitation and without exception, any and all information in connection with, related to or otherwise concerning a Transaction.

(g)     The Debtors and the investment banker (if applicable) shall keep the DIP Lender fully informed with respect to the investment banker's progress in consummating a Transaction, and shall regularly communicate with the DIP Lender with respect to such information.

27.     *Events of Default.* In addition to those terms and conditions set forth in the Term Sheet and DIP Loan Documents, the following shall constitute events of default under this Order (collectively, "**Events of Default**" and individually, an "**Event of Default**"):

(a)     The Debtors materially breach any of the terms and conditions or covenants of the Interim Order or this Final Order (including the milestones in the proceeding section of this Final Order) or the DIP Loan Documents or fail to pay any obligation, including, but not limited to, principal and interest on the DIP Loan within 3 days of the date due;

(b)     If any written representation or warranty made by any Debtor after entry of the Interim Order or this Final Order or any certificate, report or financial statement delivered to the DIP Lender by any Debtor pursuant to the Interim Order or this Final Order proves to have been false in any material respect as of the time when made or given;

(c)     If any Debtor's Chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code;

(d)     If a Chapter 11 trustee is appointed in respect of any Debtor;

(e)     If any modification is made to this Final Order which affects the DIP Lender's rights or remedies without the consent of the DIP Lender;

(f)     If the Debtors receive notice of a default upon their obligations under a material contract, including the Dominion Contract.

(g)     If the Debtors materially default on their obligations to the DIP Lender under the Interim Order or this Final Order or with respect to any post-Petition Date obligations to any other person, including any and all adequate protection payments contemplated herein, and such default is not cured within 5 days after the Debtors receive written notice of the default;

(h)     If the Debtors or any third parties obtain confirmation of a plan of reorganization or liquidation on terms which alter the terms of this Final Order in any materially adverse manner to the DIP Lender or do not provide for payment in full of the DIP Loan on the effective date of confirmation of such plan;

(i)     If any third party is granted a senior or *pari passu* security interest in any of the Collateral without the DIP Lender's prior, written consent;

(j)     Any representation, warranty or statement made by any Debtor, in any borrowing base certificate, any other certificate, statement or document delivered pursuant to the terms hereof, or in connection with the transactions contemplated by the Interim Order or this Final Order should at any time be false or misleading in any material respect as of the time when made or given;

(k)    The CRO is no longer retained by the Debtors; or

(l)    The Debtors fail to satisfy any conditions precedent required by the Dominion Amendment.

Notwithstanding the provisions of this Final Order, the Interim Order, the Term Sheet, or the DIP Loan Documents, the Debtors shall provide the DIP Lender and its counsel with written notice of a proposed consensual final order granting any creditor or party in interest relief from the automatic stay. No later than 5 business days after the Debtors provide such notice, the DIP Lender shall provide the Debtors with a determination of whether such consensual final order granting relief from the automatic stay constitutes an event of default. Failure of the DIP Lender to timely reply shall constitute waiver with respect to that particular proposed consensual final order granting relief from the automatic stay. Any proposed consensual final order shall either contain the DIP Lender's endorsement or a statement that the DIP Lender has failed to timely reply.

28.    *Preservation of Rights Granted Under the Final Order.*

(a)    If an order dismissing any of the Bankruptcy Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the DIP Liens and the Superpriority Claims granted to the DIP Lender pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been indefeasibly paid and satisfied in full (and that such DIP Liens and Superpriority Claims shall, notwithstanding such dismissal, remain binding on all parties in interest), (B) the other rights under this Final Order shall not be affected, and (C) this Court shall retain jurisdiction, notwithstanding such dismissal and to the fullest extent permitted by law, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph.

(b)    If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any lien, or the priority thereof authorized or created hereby or pursuant to this Final Order. Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral, or DIP Obligations incurred by the Debtors to the DIP Lender before the actual receipt of written notice by the DIP Lender of the effective date of such reversal, modification, stay or vacatur shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in sections 363(m) and 364(e) of the Bankruptcy Code and this Final Order, with respect to all uses of Cash Collateral and DIP Obligations.

(c)    The DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Final Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Bankruptcy Cases to a case under chapter 7, dismissing any of the Bankruptcy Cases, or terminating the joint administration of these Bankruptcy Cases, or (ii) the entry of an order confirming a Chapter 11

17

plan in any of the Bankruptcy Cases. The terms and provisions of this Final Order shall continue in these Bankruptcy Cases, in any successor cases if these Bankruptcy Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Lender granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash.

29.    *DIP Lender's Right to Credit Bid.* The DIP Lender shall have the right to "credit bid" the full amount of its claims, including without limitation, claims on account of outstanding principal, interest and any other amounts due and owing under the DIP Loan, during any sale of the Debtors' assets (excluding sales in the ordinary course of business), including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan.

30.    *No Waiver.* No delay on the part of the DIP Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power and privilege hereunder preclude other or further exercise thereof, or the exercise of any other right, power or privilege. The rights and remedies hereunder specified are cumulative and not exclusive of any rights or remedies which, the DIP Lender, or Debtors may otherwise have.

31.    *No Control by DIP Lender.* The transactions contemplated by the DIP Loan are not intended to provide the DIP Lender with sufficient control over the Debtors so as to subject the DIP Lender to any liability (including, without limitation, environmental liability as an owner," "operator," or "responsible person" as those terms are used in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorizations Act of 1986) in connection with the management of the Debtors' businesses or any of the Debtors' properties. By providing the DIP Loan or taking any actions pursuant to the Interim Order, this Final Order, or the DIP Loan Documents, the DIP Lender shall not: (1) be deemed to be in control of the operations or liquidation of the Debtors or (2) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or liquidation of the Debtors.

32.    *Modification.* If any or all of the provisions of this Final Order are hereafter modified, vacated, stayed or terminated by subsequent order of this Court or any other court, such modification, vacation or stay shall not affect (a) the validity of any debt under this Final Order to the DIP Lender that was incurred pursuant to this Final Order prior to actual receipt of written notice by the DIP Lender of the effective date of such modification, vacation, stay or termination, or (b) the extent, validity, priority and enforceability of any lien or security interest of the DIP Lender granted pursuant to this Final Order. Notwithstanding such modification, vacation, stay or termination, any obligations of Debtors pursuant to this Final Order arising prior to actual receipt of written notice by the DIP Lender of the effective date of such modification, vacation, stay or termination shall be governed in all respects by the original provisions of this Final Order and the DIP Lender shall be entitled to all of its rights, privileges and benefits hereunder and thereunder including, without limitation, the liens, security interests, priorities and collection rights granted herein to or for the benefit of the DIP Lender with respect to all borrowings and advances made pursuant to this Final Order.

33.    *Binding Effect; Successors and Assigns.*  The provisions of this Final Order, including all findings herein, shall be binding upon all creditors of the Debtors and all other parties in interest in these Bankruptcy Cases, including, without limitation, the DIP Lender, the Committee (if any) and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender, and its respective successors and assigns, and the Debtors.  The DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

34.    *Effectiveness.*  This Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution of effectiveness of this Final Order.

Dated:  __August 26, 2014__

United States Bankruptcy Judge

Entered on Docket:

We ask for this:

__/s/  Robert S. Westermann__
Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:  (804) 771-9500
Facsimile:  (804) 644-0957
E-mail: rwestermann@hf-law.com
          rgreenleaf@hf-law.com

*Counsel for the Debtors*

Seen and agreed to:

__/s/ Patricia K. Burgess__
Patricia K. Burgess, Admitted Pro Hac Vice
FROST BROWN TODD LLC
250 West Main Street, Suite 2800
Lexington, Kentucky 40507
Telephone: (859) 231-0000
Facsimile: (859) 231-0011
E-mail pburgess@fbtlaw.com.
   *Counsel for Community Trust Bank*

19

Seen and not objected to:

 /s/  Peter M. Pearl
Peter M. Pearl, Esquire (VSB #22344)
Spilman Thomas & Battle, PLLC
P. O. Box 90
Roanoke, Virginia 24002
Telephone: (540) 512-1832
Facsimile: (540) 342-4480
ppearl@spilmanlaw.com
*Counsel for Branch Banking and Trust Company*

# EXHIBIT 1

**Term Sheet**

IBCS MINING, INC.
IBCS MINING, INC., A KENTUCKY DIVISION
SUMMARY OF TERMS AND CONDITIONS
FOR DEBTOR-IN POSSESSION FINANCING
JULY 16, 2014

*Set forth below for discussion purposes only is a non binding summary of the principal terms and conditions of the debtor-in-possession loan (the "Loan" or the "DIP Facility") and the documentation related thereto. Among other terms and conditions, the Loan shall be subject to the negotiation, execution and delivery of a definitive credit agreement and related loan documents, security documents and other supporting instruments and agreements embodying the terms set forth herein reasonably satisfactory to Borrower and Lender (the "DIP Loan Documents"), and each of the foregoing shall contain terms and conditions customary in such agreements and documents. The Loan shall also be subject to the approval of the Court in the Chapter 11 Cases.*

## DIP FACILITY

| | |
|---|---|
| **Borrowers:** | IBCS Mining, Inc., a Delaware corporation, and IBCS Mining, Inc., a Kentucky Division, a Kentucky corporation (collectively, the "Company" or "Borrower"). |
| **Lender:** | Community Trust Bank, Inc. (the "Lender" or "DIP Lender") |
| **Company Bankruptcy Filing:** | On June 27, 2014, the Company filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Virginia (the "Court"), Case Nos. 14-61215, 14-61216 (the "Cases"). |
| **Loan Amount:** | The DIP Financing Facility is a $1.5 million superpriority senior secured term loan, to be drawn upon entry of the Interim Order, in accordance with advances approved by the DIP Lender in compliance with the Budget, and such advances to conform strictly to the Budget until the Debtors have satisfied all conditions precedent to the Dominion Amendment (as defined below). |
| **Maturity:** | The Loan shall be due on the earliest of (the "Maturity Date"): (i) December 15, 2014; (ii) the occurrence of an Event of Default; (iii) the closing of a sale pursuant to an Order authorizing a sale of all or substantially all of the Debtors' assets; or (iv) the effective date of any confirmed plan of reorganization. |
| **Fees:** | **Closing Fee:** The Company shall pay the DIP Lender a non-refundable facility fee of (i) $40,000 which will be payable upon the entry of an Interim Order approving the Loan, and (ii) $40,000 which |

1

will be payable upon the Maturity Date with such funds to be escrowed for payment upon Maturity.

**DIP Lender Expenses**: At closing of the DIP Facility, payment of all legal and advisory fees and expenses incurred to such date by Lender in connection with the DIP Facility shall be paid by the Borrower. The fees paid hereunder shall be paid by way of advance to the Borrower under the DIP Facility. Lender shall also be entitled to all reasonable fees and out-of-pocket costs and expenses incurred in enforcing its rights and remedies related to the Loan, except that, notwithstanding the foregoing, the Company shall not be responsible for any such fees, costs and expenses caused by Lender's gross negligence or willful misconduct.

**Advances:**

Subject to all of the terms and conditions set forth in the Loan Documents and in the Interim Order and the Final Order, Borrower is authorized to request from time to time, and Lender may make, Advances on the DIP Facility in strict compliance with a budget (the "Budget"), which is subject to Lender's approval in Lender's sole and absolute discretion. All requests by Borrower for Advances shall be made in such manner and form and with such prior notice to Lender as Lender may reasonably require from time to time pursuant to a request form acceptable to the Lender in the Lender's sole and absolute discretion. All requests for Advances must be made by the Borrower's CRO, David Stetson, in writing and signed by Mr. Stetson. In no event shall Lender be obligated to make any Advance (a) if the request for an Advance is not in strict compliance with the Budget, (b) if a Default or an Event of Default shall have occurred under the DIP Loan Documents, the Interim Order and the Final Order, and (c) if such Advance would cause the total principal amount of Advances made and outstanding under the DIP Facility to exceed the Loan Amount. Even if the total principal amount of Advances outstanding shall at any time and for any reason exceed the Loan Amount, Borrower shall nonetheless be liable for the entire principal amount outstanding, with interest thereon at the rate and calculated in the manner provided herein, in the DIP Loan Documents, in the Interim Order and in the Final Order. Borrower shall be liable for the repayment of each Advance, with interest at the rate and calculated in the manner provided herein and in the DIP Loan Documents.

**Initial Advance:**

The initial advances shall be used by the Borrower to: (i) pay professional and other fees, costs and expenses associated with the Cases (including the negotiated adequate protection payments identified below), (ii) fund the operational and working capital needs of the Company consistent with the Budget and (iii) reimbursement of the Lender's costs, fees and expenses incurred in connection with the

2

DIP Facility.

**Interest Rate:**  The Loan Amount will accrue interest at the rate of Wall Street Journal Prime + 4% (with a floor of 7.5%) per annum. Interest on the Loan Amount will be calculated on a 360-day year and actual number of days elapsed in each calendar month.

**Default Rate:**  At any time when an Event of Default has occurred and is continuing under the DIP Loan Documents, the Interim Order or the Final Order, all amounts outstanding under the Loan shall bear interest at 3% above the interest rate otherwise applicable thereto.

**Repayment:**  Interest on the Loan shall be due and payable on the first business day of each month in arrears. Payments on the Loan will be made from cash generated from the business operations of the Borrower and from the net proceeds of the Collateral in the possession of Borrower or acquired by the Borrower after the commencement of the Chapter 11 Cases, as more specifically set forth in the DIP Loan Documents, Interim Order and in the Final Order. Payments will be applied in Lender's sole and absolute discretion to accrued interest, fees and expenses (including fees and disbursements of counsel) and principal. The entire balance of principal and accrued and unpaid interest thereon will be due and payable in full at the Maturity Date of the Loan.

**Priority:**  Amounts owed by Borrower to Lender on account of the Loan, including but not limited to all principal, accrued interest, fees, costs and expenses shall constitute, in accordance with section 364(c)(1) of the Bankruptcy Code, an allowed super-priority administrative claim having priority over any or all administrative expenses and all other claims against the Borrower, now existing or hereafter arising, of any kind whatsoever, including the kind specified in, among other sections, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code.

**Collateral Security:**  Subject only to valid, perfected, unavoidedable and enforceable purchase money security interests (the "Permitted Senior Liens"), the DIP Facility, including accrued interest, principal, costs, fees and expenses, shall be secured in accordance with sections 364(c) and (d) of the Bankruptcy Code by first priority, senior priming liens on and security interests in all of Borrower's assets, property and proceeds thereof arising, created or acquired before or after the Petition Date, including, without limitation, property and interests of Borrower of any nature whatsoever, real and personal, tangible and intangible, including without limitation accounts receivable, general intangibles, payment intangibles, supporting obligations, investment property, commercial tort claims, inventory, rolling stock, machinery,

3

equipment, subsidiary capital stock, chattel paper, documents, instruments, deposit accounts, contract rights, litigation recoveries (but excluding those arising under chapter 5 of the Bankruptcy Code), all proceeds under the supply contract assumed by the Company pursuant to the Dominion Motion, a mortgage on the Company's 463 acre mine site (including certain unmined coal therein), approximately 5.2 million ton GOB pile located thereon, and all licenses and permits related thereto (collectively, the "Collateral"), all as more specifically set forth herein, the DIP Loan Documents, the Interim Order and the Final Order.

For clarification only and subject only to the Permitted Senior Liens, the Loan obligations shall be secured by (1) first-priority liens on unencumbered Collateral; (2) junior liens on Collateral subject to Permitted Senior Liens; and (3) priming liens on all other encumbered Collateral.

**Lien Validation and Perfection:**

All liens authorized and granted pursuant to the Interim Order and the Final Order entered by the Bankruptcy Court approving the DIP Facility and the adequate protection in favor of the Lender shall be deemed effective and perfected as of the Petition Date, and no further notice or act will be required to effect such perfection.

**Adequate Protection:**

No payments of principal or interest will be made by the Borrower on account of any obligations owing to third parties, whether secured by pre-petition encumbered collateral owned by Borrower or not, as long as any amount is outstanding to the Lender under the DIP Facility, except as expressly set forth below, in the DIP Loan Documents, the Interim Order and the Final Order:

(a) *Wells Fargo*: Prior to August 30, 2014, the Company (IBCS Kentucky) shall open a segregated demand deposit account, initially funded with a $25,000 deposit (the "Wells Fargo Cash Collateral Account"). The lien of Wells Fargo shall attach to the Wells Fargo Cash Collateral Account with the same priority, extent, and validity as the Wells Fargo lien attached pre-petition to the GOB coal pile of the Company (IBCS Kentucky). The lien of the DIP Lender is subordinate to the lien of Wells Fargo in and to the Wells Fargo Cash Collateral Account. The lien of Wells Fargo in and to the Wells Fargo Cash Collateral Account shall be deemed perfected without further documentation, action, or filing by Wells Fargo. Subject to the terms of the Final Order, IBCS Kentucky shall make additional deposits of $25,000 to the Wells Fargo Cash Collateral Account prior to the end of each month subsequent to July, 2014.

(b) *BB&T*. On or before August 30, 2014, the Company shall pay to

4

BB&T, via wire transfer, $25,000, and, subject to the terms of the Final Order, on or before the last day in each subsequent month, the Company shall pay to BB&T, via wire transfer, $25,000.

(c) *People's United.* Starting August 30, 2014, and, subject to the terms of the Final Order, on the last day of each subsequent month, the Company shall pay to People's United $23,253 via wire transfer; provided, however, the Company and People's United may agree to reduce this amount to the extent the Company relinquishes and turns over possession of any equipment collateral. To the extent any equipment collateral is relinquished and turned over to People's United, no further order or relief shall be required.

| | |
|---|---|
| **Limitations on Use Of Loan and Cash Collateral:** | No portion of the Loan, the Collateral or the Cash Collateral shall be used or be available to pay any fees, disbursements, costs or expenses incurred by any party in connection with: (i) challenging the amount, extent, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations under the DIP Order, or the security interests and liens of the DIP Lender in respect thereof; or (ii) the investigation (including discovery proceedings), assertion, initiation or prosecution of any other claims, causes of action, adversary proceedings or other litigation against the DIP Lender. |
| **Disposition of Collateral:** | Borrower shall not sell, transfer, lease, encumber or otherwise dispose of any Collateral pursuant to section 363(b) of the Bankruptcy Code or otherwise (a "Disposition Event") unless all obligations owed to the Lender on account of the Loan, as set forth in the DIP Loan Documents, or the Interim Order or the Final Order will be indefeasibly paid in full from the proceeds of the Disposition Event or otherwise, or upon the written consent of the Lender. In the event a Disposition Event occurs as to which the Lender does not receive full repayment of the Loan, the Lender shall have no further obligation to make post-petition Advances or other financial accommodations to Borrower and the full amount of the Loan shall be immediately due to the Lender. Borrower shall not, without the consent of the Lender together with an order of the Bankruptcy Court, enter into any agreement to return any assets to any of the Borrower's creditors for application against any pre-petition indebtedness under any applicable provision or section of the Bankruptcy Code, or consent to any creditor taking any setoff against any of its pre-petition indebtedness unless the Lender consents in writing to such Disposition Event, and provided that any Disposition Event that is pending as of the date of the Loan is subject to the prior approval of the Lender. |
| **Conditions** | The closing of the DIP Facility, the initial funding of the DIP Facility, |

5

**Precedent:**

and each subsequent Advance thereunder, shall be subject to conditions precedent customary and appropriate for financings of this type, including but not limited to: (a) submission of a request for an Advance in strict compliance with the Budget; (b) approval of each Advance by Lender in its sole and unfettered discretion; (c) receipt by Lender of a certification from Borrower that no Event of Default has occurred and is continuing as of the closing date, or will occur after giving effect to the transactions contemplated by the DIP Loan Documents for the DIP Facility, the Interim Order or the Final Order; (d) the parties entering into the DIP Loan Documents, in form and substance acceptable to the Lender, in its sole and unfettered discretion; (e) satisfaction of all conditions to be set forth in the DIP Loan Documents, the Interim Order or the Final Order and satisfactory in form and substance to Lender, which shall include completion of all due diligence deemed necessary by Lender in its sole discretion; (f) delivery of (i) a Budget satisfactory in form and substance to the Lender in its sole and absolute discretion and (ii) such other financial information and projections regarding Borrower reasonably requested by Lender, each in form and substance reasonably satisfactory to Lender and delivered at least two Business Days prior to the entry of a Final Order; (g) entry of an Interim Order and a Final Order in forms acceptable to the Lender in the Lender's sole discretion by the Bankruptcy Court approving the DIP Facility, its super priority status and all liens securing the DIP Facility and containing such other orders and findings as the Lender may request and otherwise in form and substance acceptable to Lender, including protection as a good faith lender under section 364(e) of the Bankruptcy Code under both the Interim and Final Orders approving the DIP Facility; (h) the reasonable satisfaction of Lender with all adequate protection payments, critical vendor payments (if any), and all other material "first day" motions and orders; (i) a waiver by Borrower, on behalf of its bankruptcy estate, of any right to assert any claims against Lender and its employees, advisors, attorneys, agents and representatives; (j) maintain existing cash management system and set up DIP bank accounts with Lender[1]; and (k) the number of Advances under the DIP Facility, which are made and outstanding at any one time, shall be acceptable to Lender in its sole discretion.

**Affirmative Negative Covenants:**

The DIP Facility shall be subject to affirmative and negative covenants and additional covenants (including financial covenants) customarily included in debtor-in-possession financing agreements, including, but not limited to: (a) delivery to Lender, by Wednesday of each week, of Borrowers' updated cash flow projections (together with a comparison

---

[1] The cash management system of the Borrower and its depository and checking bank accounts shall have controls in place that are reasonably acceptable to the Lender.

of actual revenue and payments to budgeted line items for the prior weekly period) in form and substance reasonably satisfactory to Lender; (b) no sales of assets without the prior written approval of Lender, other than sales in the ordinary course of Borrower's business; (c) reporting requirements reasonably satisfactory to Lender, together with any additional covenants appropriate in the context of the DIP Facility, including, without limitation, covenants providing adequate protection for Lender against any material diminution of the collateral value, all as required by Lender in its sole discretion; (d) collection of receivables in accordance with the Budget; (e) sales of product in accordance with the Budget; and (f) use of proceeds in accordance with the Budget.  In addition to the foregoing, the post-petition credit agreement shall contain covenants requiring Borrower to provide representatives from Lender or its affiliates with reasonable access to its books, records, financial statements, budgets, business plans and other reports and financial models, and reasonable access to all personnel of Borrower, promptly upon the reasonable prior request any such representative of Lender.

**Remedies:**

Upon any Event of Default under the DIP Loan Documents, the Interim Order and the Final Order and/or upon the Maturity Date, Lender shall have customary remedies, including, without limitation, the right to realize on all Collateral, the right to exercise any remedy available under definitive documentation for the DIP Facility and applicable law, without the necessity of obtaining any further relief or order from the Bankruptcy Court.  Section 362 of the Bankruptcy Code relief from the automatic stay in favor of Lender shall be embodied in the Interim Order and in the Final Order permitting the Lender to exercise its remedies against the Collateral, upon five (5) days written notice to the Borrower, the United States Trustee and counsel to the Committee (if any), without further order or orders of the Bankruptcy Court.

**Additional
Conditions
To Financing:**

Advances under the DIP Facility are also conditioned upon the following:

(1) Compliance with Bankruptcy Rule 4001 of the Federal Rules of Bankruptcy Procedure and the entry of the Interim Order and the Final Order, together with any other order reasonably requested by Lender authorizing and approving the DIP Facility in form, substance and amount and providing for the super-priority administrative claims and priming liens described herein, all acceptable to Lender in the Lender's sole discretion.

(2) David Stetson being appointed and continuing to be retained as the Chief Restructuring Officer ("CRO") of the Company

7

pursuant to an agreement reasonably acceptable to the DIP Lender and by Order of the Court reasonably acceptable by the DIP Lender; and Ed Scarborough having no managerial, financial, or executive authority or responsibility at either of the Companies.

(3) The Borrower and Dominion entering into an amendment of the Dominion Contract (the "Dominion Amendment"), all in a form acceptable to Lender in the Lender's sole discretion and approved by the Bankruptcy Court.

(4) Borrower has entered into an agreement with ███████ ████████████████████████████████ (collectively, the "Bidders") wherein the Bidders agree to offer a minimum of ██████████ to the Company for substantially all of its assets in a form acceptable to Lender in the Lender's sole discretion.

(5) The Borrower shall file a Motion to approve a stalking horse bid, acceptable to Lender in its sole discretion, together with a bid procedures motion by September 30, 2014.  The sale of Borrower's assets shall close no later than December 15, 2014.

**Events of Default:**   Events customarily included in debtor-in-possession financing agreements (collectively, "Events of Default"), including, without limitation:

- The Chapter 11 Cases shall be converted to cases under Chapter 7 of the Bankruptcy Code or be dismissed.

- Filing or support of a proposed plan of reorganization that is not acceptable to the Lender, in the sole and unfettered discretion of the Lender.

- Entry of a final order confirming a plan of reorganization that is not acceptable to the Lender, LLC, in the sole and unfettered discretion of the Lender.

- The appointment of a chapter 11 trustee under section 1104 of the Bankruptcy Code, without the prior written consent of the Lender.

- Appointment of an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

- Entry of a final order by the Bankruptcy Court amending,

8

supplementing, staying, vacating or otherwise modifying the DIP Facility, the Interim Order or Final Order approving the DIP Facility without the prior written consent of Lender.

- Any attempt by Borrower to obtain, or if any other party in interest obtains, an order of the Bankruptcy Court or other judgment, and the effect of such order or judgment is to, invalidate, reduce or otherwise impair Lender's claims and liens as provided in the Interim Order and the Final Order, or to subject Lender's Collateral to any surcharge pursuant to section 506(c) of the Bankruptcy Code.

- Borrower applying for an order substituting any assets for all or any portion of the Collateral.

- Any payment on, or application for authority to pay, any pre-petition claim other than those required to be paid with the DIP Facility pursuant to the terms of the DIP Facility, without Lender's prior written consent.

- A final order is entered granting any creditor or party in interest relief from the automatic stay.

- Failure to make all payments under the DIP Facility, the DIP Loan Documents, the Interim Order and the Final Order when due, subject to any applicable grace period.

- Failure to pay any undisputed, material post-petition taxes or indebtedness.

- Breach of any covenant of the DIP Facility, the Interim Order and the Final Order after notice of passage of any applicable grace periods.

- Any representation or warranty made by Borrower is incorrect or misleading in any material respect when made.

- Failure of Borrower to pay any sum due Lender under any part of the Loan, when and as the same shall become due, whether at the due date thereof, by demand, by acceleration or otherwise.

- Occurrence of a default or event of default by Borrower with respect to, or acceleration or demand for payment prior to maturity of, any indebtedness of Borrower to any person, or

9

with respect to any lien securing any indebtedness of Borrower.

- Failure of Borrower to observe or perform any warranty, covenant, condition or agreement to be observed or performed by the Borrower under the DIP Loan Documents, the Interim Order and the Final Order or any of the other agreements related to the Loan.

- Other Events of Default of the type contained in standard post-petition financing loan documents to the extent customary in debtor-in-possession financing agreements.

- Any action or proceeding is commenced which seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind the extent, legality, validity, priority, perfection or enforceability of any of the Lender's liens on or security interests in the Collateral.

- Others to be determined and set forth in the Interim Order and in the Final Order.

- The CRO is no longer retained by the Borrower.

- Failure of the Borrower to pay its tax obligations current from and after the Petition Date.

- The entry of an order by the Bankruptcy Court allowing an administrative priority tax or employee claim that is in excess of the amounts set forth in the Budget.

- Failure of the Borrower to operate in strict compliance with the Budget, including but not limited to, meeting projections for sales and revenue, which shall be measured on a weekly basis.

- Failure of the Borrower to meet the Sale Milestones as set forth in the Interim Order and in the Final Order.

- The Debtors fail to satisfy any conditions precedent required by the Dominion Amendment.

| | |
|---|---|
| **Professional Fees and US Trustee Fees:** | Lender will consent to funding a professional fee account and to payment of United States Trustee fees in the amounts set forth in the Budget. |
| **Indemnification:** | The Borrower, and each of its equity holders, shall indemnify and hold |

10

Lender and its respective officers, directors, employees and agents (including all of their professionals) (each an "Indemnified Party") harmless from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, all reasonable fees and disbursements of attorneys and other professionals) to which any Indemnified Party may become liable or which may be incurred by or asserted against any Indemnified Party, in each case in connection with or arising out of or by reason of any investigation, litigation or proceeding arising out of or relating to or in connection with the DIP Facility, the DIP Loan Documents, the Interim Order, the Final Order, any obligation, or any act, event or transaction related or attendant thereto or any use or intended use of the proceeds of the DIP Facility, except to the extent the same is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

**Other Conditions:**

1.    Borrower agrees to pay all of Lender's reasonable and customary expenses, including legal fees and costs, incurred relating to the origination and closing of the Loan. Borrower further agrees to pay, on a monthly basis, all of Lender's reasonable and customary expenses, including legal fees and costs, incurred in administering the Loan.

2.    Satisfaction of all normal and customary Lender credit and due diligence checklist conditions to close including, without limitation, customary due diligence relating to title, survey, organizational entities and review of other documents, information and matters as determined in Lender's sole discretion. Borrower shall immediately provide copies of all current leases and contracts to Lender.

3.    The Interim Order and the Final Order will more specifically provide for the operation of the Borrower' properties and business by the CRO. The Borrower will prepare the budgets for operation of the Borrower' properties and business, for submission and approval by Lender. The Borrower will be solely responsible in their independent discretion for making any requests for advances under the Loan.

4.    No other incurrence of debt (other than normal trade debt) or granting of liens by Borrower will be allowed, without Lender's prior written approval.

5.    Nothing in the Interim Order or the Final Order will preclude additional requests for adequate protection by the Lender that

11

are not inconsistent with the Interim Order or the Final Order.

6.      Any of Borrower's subsidiaries who hold assets or claims will be debtors in bankruptcy and parties to the Interim Order and the Final Order.

7.      Lender is free to sell or assign any or all of its rights under the Loan, the Interim Order or the Final Order.

8.      At Lender's option, Borrower will establish one or more lockboxes for deposit of all receipts, provided that any such requests will be consistent with the guidelines of the United States Trustee.

9.      Proceeds from operations of the Borrower that do not constitute sales of assets outside the ordinary course of business shall be used in accordance with the Budget.

10.     The proceeds of any sale of assets shall be immediately paid to the Lender on the closing of the sale(s) and applied to the Loan.

11.     All reclamation claims asserted against the Borrower, claims brought against the Borrower under section 503(b)(9) of the Bankruptcy Code and claims or any and all third parties shall be subordinated to the liens and superpriority administrative claims granted to the Lender in the Interim Order and in the Final Order.

12

## EXHIBIT 2

### Budget

**BROS MINING, INC**
**BUDGET FOR COMMUNITY TRUST BANK**

| | Budget 8/24/2014 | Budget 8/31/2014 | Budget 9/7/2014 | Budget 9/14/2014 | Budget 9/21/2014 | Budget 9/28/2014 | Budget 10/5/2014 | Budget 10/12/2014 | Budget 10/19/2014 | Budget 10/26/2014 | Budget 11/2/2014 | Budget 11/9/2014 | Budget 11/16/2014 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shipments:** | | | | | | | | | | | | | | |
| Total tons shipped | | | | | | | | | | | | | | |
| Assumed price per ton | | | | | | | | | | | | | | |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| Operating cash receipts - Dominion | | | | | | 82,640 | | 123,960 | | | 691,750 | | | 2,071,855 |
| Operating cash receipts - Other customers | | | | | | | 87,000 | 130,500 | | | | | | 217,500 |
| Other cash receipts | | | | | | | | | | | | | | |
| **Operating cash disbursements:** | | | | | | | | | | | | | | |
| Compensation and benefits | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 15,577 | 202,500 |
| Water monitoring | | | | | | 500 | | | | | | | | 500 |
| Bonds and permitting | 4,800 | 18,105 | | 3,300 | | | | | | | | | | 29,405 |
| Fixed construction/maintenance | 200 | 5,350 | | 3,850 | | 200 | 2,200 | 350 | 200 | 2,200 | | 1,600 | | 16,000 |
| Insurance (General Liability, Workers Comp, etc) | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 45,500 |
| CGOA | 22,500 | | | 22,500 | | 22,500 | | 22,500 | | | | | | 90,000 |
| Engineering | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | |
| Contract mining costs | | | | 150,000 | 150,000 | 150,000 | 66,000 | | 165,000 | 565,000 | 565,000 | 578,000 | | 1,479,500 |
| **Total operating cash disbursements** | 46,577 | 31,665 | | 44,827 | 178,377 | 61,863 | 107,777 | 45,327 | 182,777 | 19,427 | 528,277 | 19,427 | 596,577 | 1,862,538 |
| **EBITDA** | (46,577) | (31,670) | (19,277) | (44,827) | 27,323 | (41,327) | 107,777 | (45,327) | 71,463 | (19,427) | 155,523 | (19,427) | 146,583 | 208,257 |
| **Cash flow from operations** | | | | | | | | | | | | | | |
| **Capital Expenditures and Contract Miner Payments** | | | | | | | | | | | | | | |
| Relocation of Gas Pipeline | 33,750 | 33,750 | | | | | | | | 300,000 | | | | 300,000 |
| Advances (Prepayment) to (from) Contract Miner for Trucking | | | | | | | | | | | | | | |
| Pond construction - MSHA | | | | | | | | | | | | | | |
| **Total Capital Expenditures and Contract Miner Payments** | 33,750 | 183,750 | 150,000 | 150,000 | (67,500) | | | | | | | | | 300,000 |
| **Bankruptcy expenses:** | | | | | | | | | | | | | | |
| 363 Sale Process (including Engineering Review) | | 25,000 | | | | | 25,000 | | 25,000 | | 25,000 | | | 75,000 |
| Professional (Legal, Acctg, Engineering) | | 25,000 | 25,000 | 25,000 | | | 120,000 | 80,000 | 50,000 | 120,000 | 150,000 | | | 500,000 |
| Epiq Bankruptcy Solutions | | 25,000 | | | | | | | | | 25,000 | | | 50,000 |
| US Trustee fees | | | | | | | | 9,500 | | | | | | 9,500 |
| Other | 10,000 | 10,000 | | 10,000 | | | 20,000 | | 10,000 | 10,000 | | 10,000 | | 60,000 |
| **Total bankruptcy expenses** | 80,000 | | 15,000 | 35,000 | | 25,000 | 145,000 | 150,000 | 61,500 | 110,000 | 130,000 | 16,000 | | 751,500 |
| **Payments of Pre-Petition Obligations** | | | | | | | | | | | | | | |
| BB&T | | | | | | 5,000 | | | 25,000 | | 25,000 | | | 40,000 |
| Wells Fargo | | | | | | 5,000 | | | 25,000 | | 25,000 | | | 40,000 |
| Payroll (to be reimbursed by contract miner) | | | | | | 23,000 | | | 23,000 | | 23,000 | | | 69,000 |
| Critical vendor payments | | | | | | | | | | | | | | 35,000 |
| **Total Lender and Vendor Payments** | | | | | | 33,000 | | | 61,500 | | 73,000 | | | 184,000 |
| **DIP facility expenses:** | | | | | | | | | | | | | | |
| Closing fee | 2,824 | 2,824 | | | | | | | | | | | | |
| Interest | | | | | 5,696 | 5,696 | | | | | 7,600 | 7,600 | | 16,318 |
| **Total DIP expenses** | 2,824 | 2,824 | | | 5,696 | 5,696 | | | | | 7,600 | 7,600 | | 16,318 |
| **Beginning cash balance** | 170,584 | 90,157 | 114,514 | 195,237 | 131,619 | 131,433 | 114,506 | 52,674 | 96,147 | 85,331 | 189,904 | 104,607 | 150,160 | 170,584 |
| **Net cash flow** | (86,427) | (345,643) | (34,277) | (233,627) | 94,823 | (91,927) | (121,832) | (143,527) | (9,817) | (124,427) | (35,296) | (20,427) | 148,883 | (1,003,521) |
| **Draw (repayment) DIP Facility** | 370,000 | 115,000 | 115,000 | 150,000 | (75,000) | 45,000 | 150,000 | 150,000 | | 150,000 | 50,000 | 25,000 | (100,000) | 981,000 |
| **Ending cash balance** | 90,157 | 114,514 | 195,237 | 111,619 | 131,433 | 114,506 | 92,674 | 99,147 | 89,331 | 189,904 | 104,607 | 150,160 | 147,043 | 147,043 |